**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**WESTERN DIVISION**

| | | |
|---|---|---|
| SWAYSEY RANKIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | No.  3:20 C 50280 |
| | ) | |
| WEXFORD HEALTH SOURCES, INC., *et al.*, | ) | Judge Rebecca R. Pallmeyer |
| | ) | |
| Defendants. | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

In 2017, Plaintiff Swaysey Rankin ("Rankin"), an inmate in the Illinois Department of Corrections' ("IDOC") Dixon Correctional Center ("Dixon") began suffering from a thyroid goiter, causing him to suffer pain and difficulty with breathing and swallowing.  The goiter was not removed for more than a year and a half.  In this lawsuit, Rankin sues Dr. Merrill Zahtz ("Dr. Zahtz"), the physician at Dixon; Susan Tuell ("Nurse Tuell"), a nurse practitioner at the facility; and Catherine Smith ("Smith"), an administrative assistant, for deliberate indifference under 42 U.S.C. § 1983.  He is also suing their employer, Wexford Health Sources ("Wexford"), a healthcare service provider who contracts with IDOC, for *Monell* liability.  Now before the court are motions for summary judgment filed by Defendants Dr. Zahtz [219], Nurse Tuell [222], Smith [213], and Wexford [216].  For the reasons stated below, the motions are denied with respect to Dr. Zahtz and Nurse Tuell and granted with respect to Smith and Wexford.

<u>**BACKGROUND**</u>

**I.      Factual Background**

**A.      Rankin's Treatment**

In 2017, Rankin began experiencing weakness, body aches, painful and difficult swallowing, coughing, and a sore throat due to a thyroid goiter.  (Rankin Dep. [215-2] at 30:11–21; Pl.'s Resp. to Zahtz SOMF [241] ¶ 17.)  He was first seen for these complaints on June 9,

2017 at sick call,[1] where he was given ibuprofen. (Pl.'s Resp. to Tuell SOMF [242] ¶ 22.) Rankin returned to sick call three days later and was seen by Nurse Mershon, who is not a party to this case. (Tuell SOMF [224] ¶ 20.) Nurse Mershon called in Nurse Tuell, the other nurse practitioner at Dixon, to physically examine Rankin. (Tuell Dep. [224-12] at 41:5–42:5.) As a nurse practitioner, Nurse Tuell had the authority to diagnose inmates, refer them for appointments, and prescribe medications under the supervision of a collaborative physician—in Nurse Tuell's case, Dr. Zahtz, a primary care physician and Medical Director at Dixon from 2017 to 2023, was her collaborative physician. (Tuell Dep. [224-12] at 17:14–21-6.) In her role as nurse practitioner, Nurse Tuell had access to inmates' medical records and past progress notes; she testified that it is "good practice" to review those notes and that she did so when seeking patients. (*Id.* at 23:15–24:4.) When she examined Plaintiff on June 12, 2017, Nurse Tuell found a large, palpable mass on his neck. (Tuell SOMF [224] ¶ 21.)

At Nurse Tuell's recommendation, on July 19, 2017, Rankin underwent an ultrasound,[2] which showed enlarged thyroid glands, measuring 8 by 4 by 7.8 cm and 3.5 by 3.3 by 7.1 cm respectively, due to a goiter. (Tuell Dep. [224-12] at 57:7–17; IDOC Records [221-12] at 4.) A goiter is another term for an enlarged thyroid—a butterfly-shaped organ that wraps around the trachea. (Pl.'s SOMF [244] ¶ 1–2.) Nurse Tuell testified that she recommended the ultrasound in order to learn about the size of the goiter, "especially since his was so visible from the outside"; she noted that for "[a] lot of thyroid glands, you don't even see any enlargement or note anything large in the anterior of the neck." (Tuell Dep. [224-12] at 56:17–23.)

The trouble swallowing that Rankin reported is also known as a "compressive" symptom, meaning that the goiter was compressing structures in the neck, like the trachea, esophagus, and

---

[1]    "Sick call" is how Dixon manages requests for medical care. Once a day, time is reserved for inmates who have made a request to see a nurse. Inmates submit their requests via a paper slip that they put into a box in their unit. (Tuell Dep. [215-12] at 26:12–28:12.)

[2]    It is unclear from the record who ultimately made the order for an ultrasound, or when the order was entered. (Tuell Dep. [215-12] at 42:10–13.)

vocal cords. (Eilerman Rep. [215-10] at 6–7.) In support of his case, Plaintiff presented expert witness testimony from Dr. Bradley S. Eilerman, an endocrinologist with over sixteen years of experience in treating thyroid goiters. Dr. Eilerman issued a report on January 31, 2025, in which he examines the standard of care for a goiter like Rankin's, and offers his opinion that Rankin's treatment deviated from that standard. (*See id.* at 11.) According to Dr. Eilerman, goiters with compressive symptoms "necessitate prompt surgical intervention," and symptoms like "difficulty swallowing, difficulty breathing, or pain represent risks of rapid progression and further complications, including life-threatening airway obstruction." (*Id.* at 7.) He opined that the standard of care for a goiter like Rankin's is to remove it in a span of days to weeks, rather than months. (*Id.* at 8.)

Defendants also offered expert testimony from Dr. Kennon Tubbs, a family practice physician who has practiced correctional medicine for twenty-five years, the last fifteen at the Utah State Prison. (Tubbs Rep. [215-9] at 1.)[3] In his March 5, 2025 expert report, Dr. Tubbs examined Rankin's care and concluded that it was reasonable in light of the delays inherent to correctional medicine. (*Id.* ¶¶ 5, 15.) While he agrees that obstructive symptoms are more urgent (*id.* ¶ 16), he disagrees that Rankin's goiter showed any evidence of compressive symptoms, and explained that a thyroid goiter is normally not an urgent condition. (*Id.* ¶¶ 15–17, 37.) He instead attributed the extent of Rankin's symptoms to obesity. (*Id.* ¶ 42.)

The parties disagree about how quickly Rankin's goiter needed to be removed, but it is undisputed that Rankin's goiter was not in fact removed for over a year and a half. Over that time, it grew considerably, eventually extending from beneath his chest all the way to the base of his tongue, causing the continuing compression of his vocal cords, trachea, and the veins in his neck,

---

[3] To the extent that Plaintiff objects to the admission of Dr. Tubbs' testimony, (Pl.'s Resp. to Dr. Zahtz SOMF [241] at 2–3), the court defers ruling on its admissibility, as its consideration does not change the conclusions of this summary judgment opinion. Where Dr. Tubbs disagrees with Dr. Eilerman, it creates a dispute of fact, and the court takes all inferences in favor of Plaintiff at this stage.

pain, difficulty breathing and sleeping, and, ultimately, more than one surgical attempt to remove it. Dr. Zahtz oversaw Rankin's treatment for the goiter, but Dr. Zahtz, who is not a specialist in thyroid disease, deferred to specialists regarding Rankin's treatment. (Zahtz SOMF [221] ¶¶ 4, 36.) And Dr. Zahtz suspected that Rankin was overstating his symptoms. He testified as follows:

> Q. Did you think Mr. Rankin was lying about being in pain?
> A. Yes, I did.
> Q. Do you think inmates are liars?
> A. Not necessarily so, but I do believe that there is an attitude that we try and get what we can get from the doctor and from the nurses and from all the other people involved as much as they can because they're incarcerated, cooped up in their prison cells, and would like to get out of their cells . . . . I do believe that they make up stories in order to be able to get something from us.
> Q. Most inmates?
> A. A fair amount.
> Q. And Mr. Rankin was one of them?
> A. I believe he was.

(Zahtz Dep. [221-3] at 227:16–228:9.)

After Rankin's first ultrasound in June 2017, another doctor at Dixon (not a party to this case) referred him to the University of Illinois Chicago ("UIC") endocrinology department. (Smith Dep. [215-7] at 27:13–19.) Catherine Smith ("Smith") was the employee at Dixon responsible for scheduling off-site referrals. Smith worked in the "medical writ" office, which deals with inmates that go off-site for appointments, which are referred to as "writ follow-ups." (Id. at 12:9–24, 18:21–19:11.) The scheduling procedure called for Smith to send the doctor or nurse's referral to the Wexford corporate office for "collegial review"—that is, review at a weekly meeting of Wexford corporate staff who decide whether to approve referrals. (Id. at 16:7–10.) Once the referral was approved, Smith would proceed with scheduling. When an inmate was referred to UIC (which was a "preferred provider"[4]), Smith would contact Barbara Johnson ("Johnson") or Antonia Pyzik ("Pyzik"), the UIC schedulers. Smith would send the referral and then call to confirm that they were working on the appointment. (Id. at 20:4–19; 24:9–16.) Johnson or Pyzik would pick a date

---

[4] The court details Wexford's relationship with UIC later in this Factual Background section.

4

for the appointment and notify Smith of the date.  (*Id.* at 14:13–15:1, 20:4–8.)  If an inmate was referred to a local hospital rather than UIC, Smith herself would call the hospital and set a date.  (*Id.* at 14:13–17, 21:14–22:2.)  Smith reviewed medical records only to see what clinic the inmate was referred to for treatment, and sometimes sat in on the collegial review calls to make notes on whether a referral was approved.[5]  (*Id.* at 14:3–17:11.)

A provider at Dixon could mark a request as "urgent," but Smith testified that such a notation did not result in any change in her scheduling process.  (*Id.* at 21:2–22.)  Barbara Johnson at UIC testified, however, that on occasion someone from Dixon would reach out to ask whether a patient could be seen sooner, in which case Johnson would contact the relevant clinic to see if that was possible.  (Johnson Dep. [215-6] at 56:20–57:5.)  Within a day or two of an inmate's return from an appointment outside the facility, Smith would ordinarily request that the outside provider send results of the procedure.  (Smith Dep. [215-7] at 50:4–10.)

Rankin eventually had an endocrinology appointment scheduled at UIC on October 9, 2017.  The doctor's notes indicate that Rankin exhibited multiple symptoms of thyroid disease, including "heat intolerance, hair falling out, brittle nails, weight gain (30lb in 6 months), hoarseness, palpitations with fleeting sharp pains across chest, dysphagia and difficulty breathing through mouth for the past year (since December, 2016)," but that he initially noticed the swelling in March 2017.  (Ex. 15 to Wexford SOMF [218-15] at 2–4.)  The doctor at this appointment ordered an ultrasound and a "fine needle aspiration," ("FNA"), a procedure in which cells are pulled from the inside of the goiter with a needle and then tested for abnormalities.  (*Id.* at 4; Zahtz SOMF [221] ¶ 19; Zahtz Dep. [221-3] at 60:15–61:5.)  The doctor also noted Rankin's difficulty breathing, "obstructive" symptoms, and "mass effect" (that is, the effect that a mass produces on nearby tissue) (Ex. 14, Zahtz SOMF [221-14] at 1–4), symptoms that Dr. Eilerman describes as

---

[5]    While the exact format of these meetings is unclear, it is often referred to as the collegial review "call," which is presumably how those from outside Wexford's corporate office, like Smith, could join.  (*See e.g.*, Smith Dep. [215-7] at 98:15–17.)

"self-evidently urgent." (Eilerman Dep. [215-11] at 121:14–15, 224:3–8.) The UIC doctor who saw Rankin in October 2017 also wrote: "Most likely patient will need surgery for the goiter but getting an FNA is helpful prior to deciding on surgery." (Ex. 15 to Wexford SOMF [218-15] at 1; *see also* Pl.'s SOMF [244] ¶ 8.)

Dr. Zahtz completed the referral for an FNA biopsy on October 16, 2017. He marked it as "urgent," and it was approved by collegial review on October 25, 2017.[6] (Zahtz SOMF [221] ¶ 21; Zhatz Dep. [215-3] at 62:25–63:2.) Smith then sent the referral and approval to UIC, but she does not remember when. (Smith Dep. [215-7] at 42:9–43:6.) As reflected in a progress note (that is, documentation of a nurse's interaction with a patient) on November 22, 2017, Rankin reported pain at a nine on a scale of one to ten in his neck and back. (Tuell Dep. [215-12] at 32:17–33:4; Ex. 24, Schubert Decl. [237-24].) On November 30, more than a month after the referral appointment had been approved in collegial review, a further progress note showed that Rankin had inquired about his follow-up, and the nurse advised him that the "writ office is working" on it. (Ex. 44 to Smith Dep. [215-7] at 51.) It is unclear when the appointment was finally scheduled, but the next record is a January 9, 2018 progress note confirming that Rankin's appointment had been scheduled for the next day. (*Id.* at 52; Smith Dep [215-7] at 46:21–47:8.)

On January 10, 2018, three months after the "urgent" referral, Rankin finally had an FNA biopsy and ultrasound. Dr. Eilerman opined that this three-month delay violated reasonable standards of care. (Eilerman Rep. [215-10] at 9.) Two days later, doctors classified Rankin's goiter as a "Bethesda category III," which correlates with a "5 to 15% risk of malignancy." (Pl.'s SOMF [244] ¶ 9.) In other words, they could not rule out cancer (the goiter was ultimately diagnosed as benign). (Pl.'s Resp. to Zahtz SOMF [241] ¶ 52.)

---

[6] Smith testified that the appointment was approved by collegial review on October 23, but the approval was "generated" on October 25. (Smith Dep. [215-7] at 41:17–42:7.)

The January 10, 2018 ultrasound showed that Rankin's right gland had grown to 9.9 x 5.8 x 4.3 cm and 10.0 x 5.1 x 4.5 cm in the left gland—more than double the size of a normal thyroid gland. (Pl.'s Resp. to Zahtz SOMF [241] ¶ 21; Eilerman Rep. [215-10] at 7; Wakefield Dep. [215-4] at 70:8–15.) One of Rankin's surgeons, Dr. Heather Wakefield, whom he did not see until later that year, testified that she would expect someone with these measurements to have trouble swallowing and breathing, which is consistent with the symptoms that Rankin had been reporting during the previous year.[7] (Wakefield Dep. [215-4] at 71:16–72:4.) The doctors at UIC recommended "[c]linical and radiologic correlations and close clinical follow-up." (Ex. 11 Wexford SOMF [221-11] at 191.)

On January 24, 2018, Nurse Tuell entered a referral for Rankin to return to UIC for review of his results; that referral was approved at collegial review on January 29. (Smith Dep. [215-7] at 51:1–4, 52:24–53:4.) Nurse Tuell testified that she understood his last ultrasound had been delayed, and she believed her referral was urgent. She did not in fact mark it as urgent, however, because she "assumed that a date was already provided to the writ office," although there was no apparent basis for that assumption. (Tuell Dep. [215-12] at 100:21–101:3.) Nurse Tuell acknowledged that she "missed not marking that [urgency]" on the form, but assumed the appointment would happen in three to four weeks. (Id. at 100:21–101:3; 102:18–103:1.)

But Rankin's appointment was not scheduled. At sick call on multiple occasions, Rankin reiterated that he was in pain and inquired about his test results. Progress notes dated February 9, 19, and 21, reflect that Rankin's appointment still had not been scheduled, and his biopsy results had not yet been received by the providers at Dixon. (Ex. 28, Schubert Decl. [237-28]; Ex. 29, Schubert Decl. [237-29]; Ex. 46, Smith Dep. [215-7] at 53, Smith Dep. [215-7] at 53:5–55:2,

---

[7] That Rankin's condition could cause him pain is not genuinely disputed. Dr. Wakefield asserted that "compressive" symptoms, while uncomfortable, do not by themselves cause pain, but she acknowledged that inflammation of the thyroid gland can cause pain. (Wakefield Dep. [215-4] at 72:5–73:2.) Dr. Eilerman opined that goiters can cause pain because critical nerves and blood vessels travel through the neck. (Eilerman Rep. [215-10] at 7.)

58:6–16.)  Rankin filed a grievance on March 3, stating that he was still in excruciating pain and did not yet have a copy of his biopsy and ultrasound results.  (*See* Grievance, Ex. 8, Schubert Decl. [237-8].)  He specifically mentioned trying to get his results through Nurse Tuell and Dr. Zahtz at sick call, reporting that Nurse Tuell and Dr. Zahtz had told him that "I'd have to wait til[l] I go back out to UIC because they wanna see me, though I complained about pain constantly everybody at Dixon Health Care Unit has told me there's nothing they can do."  (*Id.* at 3.)   A March 8, 2018 progress note shows that Rankin again reported trouble swallowing and pain and noted that the "writ office will call" to get the biopsy results.  (Ex. 29, Schubert Decl. [237-29]; Ex. 47 to Smith Dep. [215-7] at 54.)

Finally on March 13, 2018, Smith emailed Johnson to request the results.  (Pl.'s SOMF [244] ¶¶ 13–14; Smith Dep. [215-7] at 70:10–71:17.)  From what the record shows, this was the first time that anyone at Dixon had made such a request.   When Rankin again inquired about his biopsy results on March 19, progress notes show that the results had finally been received.  (Ex. 48 to Smith Dep. [215-7] at 55.)

Dr. Zahtz discussed the results with Rankin at an appointment on March 20, 2018.  (Pl.'s SOMF [244] ¶ 15.)  But the purpose of that appointment was just to discuss a follow-up referral; in fact, Rankin had not yet had a follow-up appointment with UIC (the one for which Tuell referred him in January), where he would be able to discuss treatment options.  (Zahtz Dep. [215-3] at 72:18–73:4.)  Almost two months later, progress notes from May 11 show that Rankin again inquired when he was going in for his follow-up at UIC.  (Ex. 31, Schubert Decl. [237-31].)  The progress note indicates that someone checked with Smith to confirm an appointment was scheduled, but they could not tell Rankin the date for security reasons, and it is not clear whether he was told that the appointment had been scheduled at all.[8]  (*Id.*)

---

[8]     The note states: "Per Cathy [in] writ office – [patient] has approved scheduled [follow-up]," but they were "unable to inform him of [appointment] date for security reasons."  (Ex. 31, Schubert Decl. [237-31] at 2.)

Rankin's throat discomfort continued, and he was again seen at sick call on May 23. (Ex. 51 to Smith Dep. [215-7] at 67.) Finally, on May 24, more than two months after his meeting with Dr. Zahtz and four months after his referral, Rankin saw an endocrinologist at UIC for his follow-up appointment. (*Id.*) At the appointment, Rankin reiterated that for the last year, he had been having trouble breathing, trouble swallowing, and could not sleep on his back due to the choking sensation. (Rankin Dep. [215-2] 87:6–21; Zahtz Dep. [215-3] at 79:9–80:2.) The endocrinologist noted that Rankin presented with hoarseness and other symptoms of thyroid disease with mass effect, including palpitations, hair loss, and brittle nails. (Ex. 15 to Wexford SOMF [215-15] at 49.) The endocrinologist discussed Rankin's options with him, along with their risks and benefits, including repeating the FNA or "surgical excision." (*Id.* at 49.) He wrote in his notes: "Patient decided to proceed with thyroidectomy which will likely help relieve some of the compressive [symptoms] he is experiencing," and recommended that he consult an ENT. (Ex. 15 to Wexford SOMF at 49.) After the discussion, Rankin affirmatively opted for a thyroidectomy.[9] (Zahtz SOMF [221] ¶ 23.)

Dr. Zahtz never made an independent determination as to whether Rankin needed surgery. This was not his job, he contends, because UIC physicians "were the specialists and he was just an internist." (*Id.* ¶ 36.) Moreover, Dr. Zahtz testified that he was not concerned about Rankin's compressive symptoms, because "[Rankin] did not have any objective evidence to indicate that he was having any of these particular problems." (Zahtz Dep. [215-3] 80:5–16.) Dr. Zahtz believes "objective evidence" is required "[b]ecause the inmates frequently will exaggerate symptoms just to get what they want." (*Id.* at 80:23–81:4.) In Dr. Zhatz's view, the compressive symptoms Rankin was reporting were a function of Rankin's "subjective feelings," "not necessarily objective findings," and the recommended thyroidectomy would not be an objective fix; instead,

---

[9] A thyroidectomy is the surgical removal of the thyroid gland. *Thyroidectomy: Overview*, Mayo Clinic https://www.mayoclinic.org/tests-procedures/thyroidectomy/about/pac-20385195 (last visited Dec. 22, 2025).

the surgery would simply make it likely "for the patient to not complain about it anymore." (*Id.* at 83:21–84:15.)   Dr. Zahtz never spoke with the endocrinologist who recommended the thyroidectomy.  (*Id.* at 84:16–19.)

Despite his skepticism, on May 19, 2018, Dr. Zahtz issued a referral for a consultation with an ENT at UIC about a thyroidectomy.  (Ex. 32, Schubert Decl. [237-32] at 2; Pl.'s SOMF [244] ¶ 18.)  At some point, however, before the appointment could be made, UIC was crossed out, and "CGH" was substituted as the hospital to which Rankin would be referred.  (Zahtz SOMF [221] ¶ 24.)[10]  Dr. Zahtz does not know exactly when he ordered this change in the referral hospital, though he likely made the change after June 14 (the referral, approved on that date, still identified to UIC as the treating hospital).  (Zahtz Dep. [221-3] at 94:25–95:6; 96:6-18.)  He also did not know whether at the time he made the change anyone at Dixon had tried contacting UIC to schedule the evaluation.  (*Id.* at 95:7–10.)   Asked why he had made the change, Dr. Zahtz explained that it was likely because Rankin "kept on coming back and asking questions about when he's going for surgery," and Zahtz decided to "go ahead and [change the hospital] so we can stop his complaints."  (*Id.* at 90:2–11.)  In addition, according to Dr. Zahtz, the change was necessary because the doctors at UIC did not consider Plaintiff's condition to be urgent enough to warrant immediate surgery.  (Zahtz SOMF [221] ¶ 24.)  When asked the basis for that opinion, he testified that if those physicians had considered it urgent, "they would have said, 'schedule him for this particular date,'" rather than just ordering the surgery.  (Zhatz Dep. [221-3] at 91:22–25.)  There is no evidence showing that anyone at Dixon had attempted to schedule the surgery with UIC, nor is it clear whether or when Smith, who was responsible for scheduling off-site referrals, called CGH for this purpose.  (Smith Dep. [215-7] at 82:1–15.)

---

[10]    CGH Medical Center is an "acute care hospital" in Sterling, Illinois, local to Dixon. *Who We Are*, CGH MEDICAL CENTER, https://www.cghmc.com/about-us/who-we-are/ (last visited Dec. 22, 2025); (Zahtz SOMF [221] ¶ 10.)

On July 20, 2018, Rankin submitted yet another grievance, stating that he was in excruciating pain and was still experiencing compressive symptoms, and that he had complained about these symptoms to several nurses at sick call, including Nurse Tuell and Dr. Zahtz. (Ex. 9, Schubert Decl. [237-9].) Rankin finally saw Dr. Wakefield, a general surgeon (not an ENT surgeon) at CGH on August 1, 2018. (Pl.'s SOMF [244] ¶ 19.) Dr. Eilerman noted that the decision to send Rankin to a general surgeon as opposed to an ENT was a deviation from the specialist's instructions to send Rankin to an ENT and that referral to an ENT would have been the standard of care for a goiter with obstructive symptoms like Rankin's. (Eilerman Rep. [215-10] at 9–10.) Dr. Tubbs disagrees that Dr. Zahtz deviated from the specialist's instructions to send Rankin to an ENT, noting that Rankin in fact saw an ENT prior to his eventual thyroidectomy. (Tubbs Rep. [215-9] at ¶ 48.) As explained below, however, it was Dr. Wakefield who sent Rankin to the ENT, not Dr. Zahtz, and Dr. Wakefield referred Rankin specifically for a vocal cord evaluation, not for a full assessment. (Pl.'s Resp. to Zahtz SOMF [241] ¶ 27.) Consequently, there is at least a dispute of fact as to whether Dr. Zahtz himself followed the specialist's instructions.

Dr. Wakefield noted that Rankin had a raspy voice. (*Id*. ¶ 49.) Because Rankin had already experienced voice changes, Dr. Wakefield required that he see an ENT for a vocal cord evaluation before surgery. (Zahtz SOMF [221] ¶ 26; Ex. 4 to Wakefield Dep. [215-4] at 56.) On August 14, Dr. Zahtz referred Rankin to the ENT consult ordered by Dr. Wakefield, which CGH had preemptively scheduled for August 16, and a thyroidectomy, which CGH had preemptively scheduled for August 30. (Pl.'s SOMF [244] ¶ 20; Zahtz Dep. [221-3] at 110:6–111:24.) Both of these appointments, however, still required Wexford's approval. The following day, Catherine Smith emailed Mark Andrews ("Andrews"), a nurse at Wexford's corporate office who gathered materials for collegial review, saying, "I should have had this guy on collegial for Mon[day] but [doctor] did not write the referral until yesterday." (Ex. 54, Smith Dep. [215-7] at 70.) Smith explained in her message that Rankin's ENT appointment for his vocal cord evaluation was

scheduled for the next day and that he needed both the referral for his ENT appointment and his surgery approved.  (Ex. 54, Smith Dep. [215-7] at 70.)  Within an hour of sending the email, Nurse Andrews took the request to a doctor at Wexford's corporate office who approved the appointments.  (Smith Dep. [215-7] at 88:17–91:3.)  Smith was able to schedule Rankin's ENT appointment and surgery at CGH before it had been approved by Wexford because, as she explained, local clinics like CGH would sometimes reach out with a date for future appointments even before receiving a formal referral from Dixon; when that happened, Smith would schedule those appointments before approval "just so we didn't lose that date."  (*Id.* at 91:24–94:13.)

After the ENT evaluated his vocal cords on August 16, the ENT cleared Rankin for his thyroidectomy.  (Pl.'s SOMF [244] ¶ 20; Zahtz SOMF [221] ¶¶ 26–28.)  On August 30, Dr. Wakefield began the surgery, but she was unable to complete it; Dr. Wakefield discovered that the goiter was "substernal," meaning it had extended into Rankin's chest.  (Pl.'s SOMF [244] ¶¶ 21–23.)  She determined that it was unsafe to proceed without the involvement of a cardiothoracic surgeon and aborted the procedure.   (*Id.* ¶¶ 22–23.)

Defendants note that the only way a doctor would have known that the goiter was substernal before surgery was via a CT scan.  (Zahtz SOMF [221] ¶ 29.)  They contend that conducting such a scan is not part of the standard of care for a thyroid goiter.  (*Id.*)  Dr. Wakefield herself did not believe a CT scan was necessary, and Dr. Tubbs, who offered no opinion of his own on this question, noted that none of the outside specialists ordered a CT scan.  (Tubbs Rep. [215-9] ¶ 46; Wakefield Dep. [215-4] at 57:10–15.)  But in Dr. Eilerman's view, for a large and growing goiter like Rankin's, a CT scan is the standard of care, and if Rankin had first been ordered to an ENT as suggested by the specialist, he may have received one.  (Eilerman Rep. [215-10] at 10; Eilerman Dep. [215-11] at 210:8–12.)  In other words, Dr. Wakefield's relative lack of experience with thyroidectomies "may have influenced the lack of CT scan."  (*Id.*)

After reviewing the notes on the aborted surgery, Dr. Zahtz referred Rankin for cardiothoracic surgery per Dr. Wakefield's request, noting that it should be arranged "ASAP."

(Pl.'s SOMF [244] ¶ 23.)  When asked why he wanted it "done sooner rather than later," Dr. Zhatz did not mention the growth of the goiter, Rankin's compressive symptoms, or the aborted surgery. Instead, he gave the "ASAP" direction "[b]ecause of the continued complaints that [] Mr. Rankin was giving everybody in terms of, When [sic] are we going to have it done? . . . When am I going to have my surgery?"  (Zahtz Dep. [221-3] at 133:10–20.)  Dr. Zahtz testified that "obviously, it was not an emergency type of situation; otherwise, everybody involved in this would have done it ASAP."  (*Id.* at 133:21–23.)  Dr. Zhatz does not recall ever communicating with Dr. Wakefield about Rankin's surgery or treatment, even after she failed to complete the surgery.  (*Id.* at 108:22– 109:14.)  Around this same time, Rankin saw Nurse Tuell again at an appointment related to his hypertension, where she observed that he still had a large thyroid goiter and a gravelly voice. (Tuell Dep. [215-12] at 109:6–111:22.)  She does not recall his expressing pain or difficulty swallowing at that appointment, but noted that he was scheduled to be seen by a thoracic surgeon and advised him to report any difficulty swallowing or breathing in the meantime.  (*Id.* at 112:22– 113:23, 118:3–8.)  It is not clear from the record whether the appointment with a surgeon had actually been scheduled at this point.

Rankin had an appointment with an ENT at UIC on October 4, 2018.  Records show the ENT found Rankin's goiter to be "very very diffusely enlarged," and that his symptoms— dysphagia, trouble breathing while lying flat, and hoarseness—were worsening.  (Pl.'s SOMF [244] ¶ 24.)  The ENT recommended a CT scan and a follow-up appointment, and Dr. Zahtz made referrals for these appointments that same day, again noting that they should be scheduled "ASAP."  (*Id.* ¶ 25.)

The CT scan, conducted on November 9, 2018, showed that the goiter had enlarged to 14.4 cm in "maximum transverse diameter," and 4 cm in "AP diameter at isthmus," and confirmed that it had extended into his chest.  (*Id.* ¶ 26.)  The scan also showed that as a result of the goiter, critical structures of Rankin's neck were being compressed, his trachea and windpipe had moved to the side, and the blood vessels were compressed to the point where they had formed alternative

paths.  (*Id.*; *see also* Cardio-Thoracic Surgery Note, Ex. 19 [237-19] at 5.)  Asked at his deposition whether the "severe narrowing of a major vein" was a "potential problem," Dr. Zahtz said "possibly, [but] you'd have to ask an expert in that particular field," and that he would expect the specialist to contact him if it was urgent.  (Zahtz Dep. [221-3] at 140:1–24.)  But Dr. Zahtz never spoke with the doctor who made these findings.  (*Id.* at 141:2–6.)

On November 15, 2018, Rankin had his appointment with the ENT at UIC, who recommended he see a cardiothoracic surgeon before his thyroidectomy.  (Pl.'s SOMF [244] ¶ 27.)  That appointment took place on December 11, 2018, and then on January 15, 2019, Rankin underwent six-hour total thyroidectomy surgery.  (*Id.* ¶¶ 27–28.)   By this time, according to the surgical notes, Rankin's goiter was "extremely large."  (*Id.* ¶ 28.)  Each thyroid lobe had expanded from his chest to the base of his tongue, with the left lobe measuring 15.1 by 9.2 by 5.4 cm, and the right measuring 13.4 by 5.9 by 9.2 cm.[11]   (*Id.*)   After surgery, Rankin's symptoms were resolved.  (*Id.* ¶ 29.)

In total, Rankin waited 582 days from the presentation of his symptoms to their resolution, a delay which Dr. Eilerman describes as "a violation of the standard of care."  (Eilerman Rep. [215-10] at 10.)  These delays consisted partly of numerous small delays between referrals and appointments for consults, and partly of lengthy delays between (1) the referral for a biopsy and the biopsy, (2) the referral for a follow-up on the biopsy and the follow-up, (3) the referral for the first surgery and surgery, and (4) the referral for the second surgery and the actual surgery.  Dr. Eilerman observed that the delays were caused in part by the decision to perform all pre-operative steps sequentially, rather than in parallel.  (*Id.*)  For example, the standard of care for a large, growing goiter would have required a CT scan.  Dr. Zahtz could have ordered the CT scan, ENT consult, and thoracic surgery consultation in parallel, rather than waiting weeks between each order.

---

[11]     Recall the initial measurements were 8 by 4 by 8 cm and 3 by 3 by 7 cm.

### B.     Wexford's Policies and Practices

Rankin also brings a *Monell* claim for deliberate indifference against Wexford, the employer of the medical staff at Dixon.   *Monell* liability allows a plaintiff to recover for a constitutional violation from a municipality, or a corporate like Wexford who is acting under the color of law.  Rankin, however, can only recover for a claim once; thus, his claim against Wexford will generate a monetary award only if (1) he proves his claim against the individuals, but Wexford fails to indemnify them (*i.e.,* pay the damages they caused), or (2) he proves that Wexford's own policies, rather than the individual defendants' actions, caused the constitutional violation. *Swanigan v. City of Chicago*, 775 F.3d 953, 962 (7th Cir. 2015) ("[I]f a municipal defendant is willing (or required) to indemnify individual defendants for compensatory damages as well as an award of attorney's fees and costs, a *Monell* claim against the municipality will offer a prevailing plaintiff no additional remedy").  With that in mind, the court now turns to the facts relating to Wexford, the corporate entity.

Wexford has contracted with the State of Illinois to provide comprehensive medical services to inmates at certain IDOC facilities, including Dixon.  (Pl.'s SOMF [244] ¶ 32.)  Should an inmate need treatment that cannot be provided at the facility, the contract calls for Wexford to arrange for the inmate to be "hospitalized at a licensed community facility," and Wexford can submit a claim for those costs.   (*Id.*; Ex. 1 to Pl.'s SOMF [238-1] at §§ 2.2.3.6.1, 3.1.2.2.) Recovery of those costs is, however, subject to Wexford's "Annual Hospital Utilization Threshold"—whenever this amount is exceeded, "adjustments" will be made to Wexford's compensation.  (Ex. 1 to Pl.'s SOMF [238-1] at 75.)  Costs that Wexford incurs for hospital services are regularly tabulated; if Wexford exceeds the Annual Threshold, its compensation by the State is reduced by the amount it exceeded the threshold.  (*Id.* at § 3.1.2; Pl.'s SOMF [244] ¶ 33.)

The contract also provided, however, that hospital services at the University of Illinois would not count toward the Annual Utilization Threshold.  (Pl.'s SOMF [244] ¶ 34.)  Referral of

patients to UIC (rather than another facility) was advantageous for a second reason as well: While most IDOC facilities required prior approval to send inmates to UIC, the contract specified that Dixon was one of five facilities where the doctors were free to refer inmates to UIC without prior approval. (*Id.* ¶ 35; Ex. 1 to Pl.'s SOMF [238-1] at 2.2.3.7(a).) Wexford's visits to UIC were capped, however, at 216 inpatient admissions and 2,160 outpatient visits in a year across *all* Wexford facilities; if Wexford referred inmates to UIC for treatment in excess of those limits, all facilities, including Dixon, required prior approval for the visit, and Wexford's compensation would be reduced by $5,000 per visit in excess of the cap. (Pl.'s SOMF [244] ¶ 35.) In other words, Wexford's use of UIC was regulated by the number of visits, rather than by the Annual Utilization Threshold.

In 2014, evidence began to come to light of systemic and excessive delays with Wexford's off-site referrals. First, an expert report was filed in federal court in the case of *Lippert v. Ghosh*, No. 1:10-cv-04603 (N.D. Il. May 19, 2015) [339], about delays in Wexford's off-site care.[12] (Pl.'s SOMF ¶ 37.) The *Lippert* Report detailed "extraordinary delays" in offsite scheduling, specifically noting that the delays "tend to revolve around the utilization of the University of Illinois," and that referrals of prisoners to local providers could speed up the process of providing them with necessary medical care. (*Id.* ¶¶ 38–39.) Wexford employees had access to this report prior to the time that Rankin was treated for goiter. (*Id.* ¶ 40.)

Second, Dixon had a Quality Improvement Committee ( "QIC"),[13] which was a committee of Wexford and IDOC employees convened monthly to review health services and operations, and the quality of care provided at Dixon. (*Id.* ¶ 41; Wexford 30(b)(6) Dep. [218-8] at 188:11–15.) In February 2017, QIC meeting notes showed the Committee planned to study "referrals that are

---

[12] Defendants object to this report as hearsay, but it is admissible for purposes of notice, and that is the only purpose for which Plaintiff has submitted it. (Pl.'s Br. [245] at 31, n.8.)

[13] Defendants also object to the QIC notes and reports as hearsay, but they appear to be admissible as business records, FED. R. EVID. 803(6), (*see* Pl.'s Br. [245] at 32, n.9).

more than 8 weeks old." (Ex. 10, Pl.'s SOMF [237-10] at 4.) The reasons for the study are not stated, but Dr. Arthur Funk, the Wexford's Regional Medical Director who testified as Wexford's Rule 30(b)(6) witness, suggested it was undertaken at the suggestion of a concerned committee member. (Wexford 30(b)(6) Dep. [218-8] at 192:2–10.) Nor is it clear why the eight-week time frame was chosen, but findings made in April 2017 referred to eight weeks as the "appropriate timeframe" for non-urgent appointments. (Ex. 12 to Pl.'s SOMF [237-12] at 2.) That report showed, however, that referrals were often delayed: the average number of days for an off-site endocrinology appointment, for example, was 134 days. (PSOF ¶ 43.) Notes from an April 2017 QIC meeting point out that Wexford itself was "[u]nable to address excessive delays" at UIC, "because UIC controls the pace with the other 4 sites utilizing UIC specialty referrals with 180 approved (shared) visits monthly," and that the findings would be presented at the "next [Office of Health Services] conference call in May." (Ex. 13 to Pl.'s SOMF [237-13] at 4.) The backlog continued, and was particularly troublesome in August 2017, around when Rankin was first being seen for his thyroid. (PSOF ¶ 45.) September 2017 meeting minutes likewise state that the "UIC scheduling process does not work with Dixon CC medical needs." (*Id.* ¶ 46.)

Despite these findings, Wexford maintained a preference that inmates who required care at an outside facility be referred to UIC for this care. (Wexford 30(b)(6) Dep. [218-8] at 64:23–65:23, 202:16–204:13.) Dr. Funk explained this preference as based on security measures UIC has implemented at its facilities, as well as the "longstanding" relationship the state has with UIC, because of its expertise in treating specialized conditions like HIV, hepatitis C, and others. (*Id.* at 66:8–67:23.) Dr. Zahtz, similarly, testified that UIC was "our go-to place for nonemergency types of procedures and referrals automatically go to UIC." (Zahtz Dep. [221-3] at 124:19–22.) He understood that "there was some sort of a relationship that the state had with the UIC that that's where they do all the care; because it's a very high academic institution, and that's where they want to give the best kind of care possible in that situation." (*Id.* at 32:17–24.) Specifically, the

"relationship" that the state had with UIC was based "on UIC's academic nature and expertise." (*Id.* at 33:13–24.)

The physician who makes a referral of an inmate for treatment outside of the correctional center also chooses which facility to request. (Wexford 30(b)(6) Dep. [218-8] at 71:20–72:9.) Smith testified that doctors usually did specify a facility where an inmate was to be referred; when this did not happen, Smith would ask the doctor. (Smith Dep. [215-7] at 22:11–21.) She had no personal knowledge of the reasons that a doctor would choose UIC versus a local hospital, and she was aware of no policy Wexford might have to change a referral from one facility to another in the event of delays. (*Id.* at 24:21–25:18.)

Despite the preference for referrals to UIC, Wexford providers themselves ultimately choose the facility for referral based on its availability and qualifications, and, according to Dr. Funk, the onsite medical director (in this case, Dr. Zahtz) does not consider costs or utilization. (Wexford 30(b)(6) Dep. [218-8] at 75:23–76:12.) In fact, providers at Dixon do not have access to cost or utilization data for offsite facilities, and Dr. Zahtz also testified that he did not consider the cost of services in a particular facility when choosing where to refer an inmate. (Pl.'s Resp. to Dr. Zahtz SOMF [241] ¶ 15; Zahtz Dep. [221-3] at 33:25–34:3 ("Q. When you were deciding which facility to send an inmate to for off-site care, did you ever consider the cost of care at that facility? A. Absolutely not.") Plaintiff urges that cost considerations did affect Wexford's decisions because of the stated preference for UIC, but Plaintiff does not dispute that individual physicians did not have access to this data and does not point to any evidence of a provider specifically considering costs in a referral decision. (*See* Pl.'s Resp. to Wexford SOMF [240] ¶¶ 41, 50.) Dr. Zahtz confirmed that "it didn't always have to be [UIC]. We would refer it to other places, depending if we could get the – a specialist for this – for different things," and that in emergency situations, inmates would go to local hospitals. (Zahtz Dep. [221-3] at 32:25–33:12.) He acknowledged, however, that UIC had gotten "bogged down" with a large number of patients, and testified that he received no guidance from Wexford on how to deal with the delays at UIC. (*Id.*

18

at 36:21–38:1.)  Dr. Funk testified that "if there was a service that needed to be completed and there was an unavailability by the University of Illinois, other providers were sought," and that Wexford's practice has always been to make adjustments depending on the realities of scheduling and shortages of specific specialties.  (Wexford 30(b)(6) Dep. [218-8] at 202:23–203:16.)  Plaintiff nevertheless insists that the cost-motivated preference for UIC was involved in Rankin's case, and that providers could have done more about the delays in his care.  (*See* Pl.'s Resp. to Wexford SOMF [240] ¶¶ 41, 43 & 47.)

## II.    Procedural History

Rankin initially filed his *pro se* complaint [1] on July 28, 2020.  In March 2021, Judge Reinhard of this court recruited counsel for Rankin.  (Order [20].)  In the Third Amended Complaint [86], Plaintiff brings claims against Monica Carpenter, Hector Garcia, Catherine Smith, Susan Tuell, Wexford Health Sources Inc, and Merrill Zahtz.  Defendants Garcia and Carpenter have since been dismissed.   Defendants Smith, Tuell, Wexford, and Zahtz now seek summary judgment and, for the reasons stated below, the motions are granted with respect to Smith and Wexford but otherwise denied.

**DISCUSSION**

## I.    Legal Standard

Summary judgment is appropriate "if there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law."  *Dunderdale v. United Airlines, Inc.*, 807 F.3d 849, 853 (7th Cir. 2015) (citing FED. R. CIV. P. 56(a)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  A genuine issue of material fact exists only if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  The movant bears the burden of establishing that the summary judgment standard is met, and if the moving party does so, the opposing party must present evidence sufficient for a jury to find in their favor on all matters on which they bear the burden of proof.  *Celotex*, 477 U.S. at 323.

## II. Analysis

"The Eighth Amendment's ban on 'cruel and unusual punishments' obligates prison officials to provide medical care to prisoners in their custody," and proscribes deliberate indifference to serious medical needs of prisoners. *Clemons v. Wexford Health Sources, Inc.*, 106 F.4th 628, 635 (7th Cir. 2024) (citation omitted). To succeed on a deliberate indifference claim, Rankin must establish that he had an objectively serious medical condition, and that the Defendants were deliberately indifferent to that condition. *Christensen v. Weiss*, 145 F.4th 743, 752 (7th Cir. 2025). Further, Rankin must show that Defendants' deliberate indifference injured him. *Stockton v. Milwaukee Cnty.*, 44 F.4th 605, 614 (7th Cir. 2022).

There is an objective and subjective component to a deliberate indifference claim. First, Rankin must show that he had an objectively serious medical condition. *Clemons*, 106 F.4th at 635. "An objectively serious medical condition is one that 'a physician has diagnosed as needing treatment' or that is so obviously serious 'that even a lay person would easily recognize the necessity for a doctor's attention.'" *McDonald v. Hardy*, 821 F.3d 882, 888 (7th Cir. 2016). Second, Rankin must show that the Defendants acted with deliberate indifference when considering their subjective state of mind. Deliberate indifference means that the Defendants "knew of and 'consciously disregarded a serious risk to his health.'" *Clemons*, 106 F.4th at 635 (citation omitted). In other words, each Defendant "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [they] must also draw the inference." *Stockton*, 44 F.4th at 615 (citation omitted). Deliberate indifference goes beyond negligence or gross negligence. *McGowan v. Hulick*, 612 F.3d 636, 640 (7th Cir. 2010) ("[N]egligence, even gross negligence, does not violate the Constitution."). Deliberate indifference can be established through inference from circumstantial evidence. *Christensen*, 145 F.4th at 752. "'A delay in treatment may show deliberate indifference if it exacerbated the inmate's injury or unnecessarily prolonged his pain,' and 'even brief, unexplained delays in

20

treatment may constitute deliberate indifference.'" *Lewis v. McLean*, 864 F.3d 556, 563 (7th Cir. 2017) (citation omitted).

Defendants do not formally dispute that Rankin's thyroid goiter was an objectively serious condition.[14] Instead, each Defendant argues that Rankin has failed to prove the subjective element of his claim—that they were deliberately indifferent to his condition—or that their deliberate indifference caused Rankin's injuries.

On this record, there is a dispute of fact as to whether the numerous delays in Rankin's care over the years caused him injury. Rankin suffered from pain and trouble swallowing, breathing, and sleeping due to the goiter. His suffering extended much longer than it would have had the delays not occurred, and a jury could infer from the evidence that the suffering worsened as the goiter grew. *Williams v. Liefer*, 491 F.3d 710, 716 (7th Cir. 2007) (affirming denial of judgment as a matter of law for defendants because "a reasonable jury could have concluded from the medical records that the delay unnecessarily prolonged and exacerbated [plaintiff's] pain and unnecessarily prolonged his high blood pressure"). Plaintiff's expert states that these symptoms could only be resolved by removing the goiter, and the record shows that they were in fact resolved after its removal. (Pl.'s SOMF [244] ¶¶ 2, 29.)

Apart from unnecessarily prolonging Rankin's pain, a jury could also infer that Rankin was put through an extra surgery due either to the delay or to Dr. Zahtz's choice of surgeon, because the goiter had grown down into his chest by the time of his first surgery, which then had to be

---

[14] Plaintiff notes that Defendants' statement of facts do seem to challenge the notion that Plaintiff's goiter was objectively serious. To the extent Defendants in fact so argue, the court finds that there is at least a dispute of fact on this issue: First, doctors who treated Rankin identified his goiter as a condition that required treatment. Second, Dr. Eilerman opined that goiters with compressive symptoms, like Rankin's, "necessitate prompt surgical intervention," and that symptoms like "difficulty swallowing, difficulty breathing, or pain represent risks of rapid progression and further complications, including life-threatening airway obstruction." (Eilerman Rep. [215-10] at 7.) Life-threatening airway obstruction would certainly be recognized as a "substantial risk" that Rankin faced as a result of his condition. *Willis v. Pfister*, No. 18-CV-333, 2024 WL 216672, at *8 (N.D. Ill. Jan. 19, 2024) ("The key point is that the serious medical condition must pose a danger or a substantial risk of harm or suffering.").

aborted. Indeed, the records show that the goiter grew considerably from diagnosis to removal, all while care was delayed on numerous occasions. Further, Plaintiff's expert opined that had Dr. Zahtz initially referred Rankin to an ENT for his surgery back in May 2018, the ENT would have been better equipped to handle the complications arising from the goiter's size. These circumstances distinguish Rankin's situation from that of prisoners in cases cited by Defendants. *Cf. Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 965 (7th Cir. 2019) (affirming summary judgment for doctor, holding inmate's continuing pain was not evidence of doctor's deliberate indifference, where inmate voluntarily stopped taking pain medication, and doctor used medical judgment in deciding to wait for test results before ordering referral, and "did what he could within the limits of his role"); *see Silva v. Mitchell*, No. 18 C 1300, 2021 WL 4477959 (N.D. Ill. Sept. 30, 2021) (denying summary judgment, distinguishing *Walker*, finding that plaintiff proved causation despite lack of expert witness, because medical records showed delays unnecessarily prolonged pain and delayed diagnosis of chronic vertigo).[15]

That leaves the question of whether the evidence supports a finding of deliberate indifference with respect to each individual Defendant.

### A.  Dr. Zahtz

Dr. Zahtz contends that Rankin received reasonable care at all times, and that a jury could not find that he was deliberately indifferent to Rankin's condition. Dr. Zahtz points to the facts that he made referrals per every specialist's recommendation, that he marked certain referrals as "urgent," and that he reviewed the results of Rankin's January 2018 ultrasound and FNA results the day after he received them. For multiple reasons, the court is unpersuaded.

First, even assuming that Dr. Zahtz's decisions or the significant delays in Rankin's care do not create an inference of deliberate indifference on their own, his testimony about his state of

---

[15]     *Cf. Gulley v. Kelly*, No. 1:17-CV-08209, 2022 WL 4079449 (N.D. Ill. Sept. 2, 2022) (granting summary judgment, finding insufficient evidence to prove plaintiff's gynecomastia [enlargement of the breasts] was caused by doctor's prescription, where disease was rare side effect of prescription and multiple non-defendant doctors also made prescription).

mind would allow a jury to find that he was deliberately indifferent to Rankin's condition. "The key question is whether the record contains the requisite evidence of a culpable mental state on the doctor's part"; indeed, "'[a] doctor who provides some treatment may still be held liable if he possessed a sufficiently culpable mental state.'" *Brown v. LaVoie*, 90 F.4th 1206, 1212 (7th Cir. 2024), *as amended* (Jan. 25, 2024) (alteration in original) (quoting *Zaya v. Sood*, 836 F.3d 800, 805 (7th Cir. 2016)).

Dr. Zahtz testified in his deposition that he believed Rankin was lying about his symptoms just to get something from him. He did not believe that Rankin had pain or trouble breathing and swallowing. And a jury could find that his disbelief was objectively unreasonable—Dr. Zahtz maintained his skepticism despite multiple specialists, on multiple occasions, noting Rankin's compressive symptoms and the large size and growth of the goiter. It is true that Dr. Zahtz marked some referrals as urgent, but Dr. Zahtz repeatedly discounted the notion that this reflected recognition that Rankin's concerns were serious; instead, Dr. Zahtz testified that he only marked referrals as urgent in order to get Rankin to stop complaining. In other words, he did not believe the treatments were truly urgent. And, as the record shows, little changed in response to requests marked "urgent," and Dr. Zahtz himself made little effort to bump Rankin's case up in the scheduling. He referred Rankin for surgery but did so only because he thought it would get him to stop complaining, not because he thought Rankin had an actual condition that needed to be resolved. Again, Dr. Zahtz thought this despite *multiple* specialists noting worsening conditions and the necessity of surgery. Dr. Zahtz maintains that Rankin was lying about his symptoms to this day. A jury could easily infer deliberate indifference from this testimony.

A jury could also find that on multiple occasions, Dr. Zahtz's care—or lack thereof—was a function of deliberate indifference to Rankin's condition, not appropriate medical judgment. "Where a plaintiff puts forward evidence that a doctor failed to exercise medical judgment, it is for the jury to decide whether the doctor had a sufficiently culpable mental state." *Id*. Rankin has presented such evidence. As Dr. Eilerman points out, Dr. Zahtz referred Rankin to a general

surgeon rather than an ENT surgeon, and he ordered sequential appointments that dragged out over years, rather than parallel more-timely appointments. Notably, Dr. Zahtz failed to communicate with any specialist that Rankin saw, despite his frank acknowledgement that he lacks knowledge of how to treat a thyroid goiter or how to interpret Rankin's results. He nevertheless concluded that Rankin's condition was not urgent because "no one told him"—even after a specialist stated as early as October 2017 that surgery would likely be necessary, and after the January 2018 results showed a risk of cancer, growth of the goiter, and compressive symptoms. Surgery was not ordered for more than 18 months after this first specialist noted it would likely be necessary. *Goodloe v. Sood*, 947 F.3d 1026, 1031 (7th Cir. 2020) ("[W]hen a doctor is aware of the need to undertake a specific task and fails to do so, the case for deliberate indifference is particularly strong.").

Further, Dr. Zahtz took no steps to ensure that Rankin's FNA and ultrasound results were requested in a timely fashion, despite his four-month delay in receiving them. Even if he had no immediate responsibility for scheduling or coordinating results, Dr. Zahtz was Rankin's treating physician and was responsible for his care. Yet there is no evidence that he ever checked to see whether results came in or that appointments were scheduled despite these significant delays. *See id.* ("'inexplicable delay' in responding to an inmate's serious medical condition can reflect deliberate indifference" (citation omitted)). Dr. Zahtz referred Rankin to a general surgeon at CGH, rather than an ENT surgeon (recommended by the doctor at UIC) and did so just to get Rankin to stop "complaining." He also did so without taking any steps to see whether anyone had first attempted to schedule the surgery with an ENT at UIC. "Taking the record evidence in the light most favorable to [Rankin], a jury could find that medical judgment did not motivate Dr. [Zahtz's] chosen course of treatment." *Brown*, 90 F.4th at 1213 (reversing summary judgment for doctor who made comments reflecting annoyance and retaliatory motive during treatment of wound without anesthesia).

The court declines to enter summary judgment for Dr. Zahtz.

24

### B.    Nurse Tuell

Nurse Tuell asks the court for summary judgment as well.  She argues that she always provided Rankin with adequate care, and was never subjectively aware of his serious condition. Specifically, she states that she only treated Rankin three times, that he made no complaints about his thyroid goiter and did not report pain or issues breathing at his appointments with her, and that she timely referred Rankin back to UIC for his follow-up appointment in January of 2018. Yet there is evidence that Nurse Tuell was both aware of Rankin's serious condition—specifically, his pain, obstructive symptoms, and pending biopsy results—yet still deviated from reasonable standards of care when the follow-up appointment that she ordered was delayed for over four months.  She failed to mark the follow-up appointment as urgent, instead simply assuming a date had been set.  Then, once the appointment took place, she did not request the results for three more months.

This evidence is sufficient for a jury to find that Nurse Tuell was aware of Rankin's serious condition and the substantial risk of harm he faced.  A "serious" condition is "one that a physician has diagnosed as needing treatment." *Knight v. Wiseman*, 590 F.3d 458, 463 (7th Cir. 2009). Nurse Tuell was the medical provider who first helped find the large mass in Rankin's neck and recommended the ultrasound to test for the size of the goiter because it was so visible, which she testified is not common, and which a specialist noted a few months later would "likely" require surgery.  Nurse Tuell testified that she never logged any trouble breathing or swallowing at her appointments with Rankin, but she in fact found the goiter at the same appointment where Rankin was seen for his trouble breathing and swallowing and pain.  She testified that she had access to medical records and patient notes, and that it was her practice to review them when meeting a patient.  Rankin's symptoms were documented multiple times in his patient notes, so a jury could infer that she was aware of Rankin's compressive symptoms.  Rankin's grievances also suggest that he directly complained about his pain and symptoms to Nurse Tuell during appointments, even if there was no written note of such complaints.

"A condition is objectively serious if failure to treat it could result in further significant injury or unnecessary and wanton infliction of pain." *Reed v. McBride*, 178 F.3d 849, 852 (7th Cir. 1999) (cleaned up). Dr. Eilerman has explained that compressive symptoms "represent risks of rapid progression and further complications, including life-threatening airway obstruction," a matter the court deems objectively serious. (Eilerman Rep. [215-10] at 7); *cf. Hatchett v. Wexford Health Sources, Inc.*, No. 17-CV-06060, 2024 WL 4346670 (N.D. Ill. Sept. 30, 2024) (finding benign lump in neck was not serious condition where there was little evidence it disrupted plaintiff's daily life or caused him serious harm). It was also Nurse Tuell who referred Rankin for his follow-up appointment after his ultrasound and FNA biopsy—meaning she was aware that he was still suffering from his condition seven months later and being tested for cancer.

The evidence thus is adequate to support a finding that Nurse Tuell was aware of Rankin's serious condition and risk of harm. Whether a jury could find that Nurse Tuell was deliberately indifferent to that risk is a closer question, but the court finds disputes of fact on this as well. Nurse Tuell did not testify to the state of mind expressed in Dr. Zahtz's testimony, but even without such evidence, "unexplained delays could support a deliberate indifference claim if [Nurse Tuell] was aware of the severity of [Rankin's] condition." *Perez v. Fenoglio*, 792 F.3d 768, 778 (7th Cir. 2015) (finding that unexplained delays—including ten months between "the time of [the] injury until the time [plaintiff] received meaningful treatment in the form of surgery," and a 24 hour delay before treatment of "a gaping wound and open dislocation"—could constitute deliberate indifference if provider knew severity of condition).

Nurse Tuell acknowledged that Rankin's follow up was urgent, and could not explain having failed to make a note of this on the referral form. She took no steps to speed up the process when healthcare staff at Dixon failed to obtain Rankin's results for more than two months after they were available, or when her own follow-up appointment referral went unfulfilled for four more months, all while Rankin continued to complain of discomfort and pain. Instead, she assumed an appointment had been scheduled, but made no effort to confirm this. Like Dr. Zahtz,

26

Nurse Tuell (a nurse practitioner) was responsible for Rankin's care, and under her care, specifically after his return from his biopsy, successful surgery was delayed for more than a year, all while his condition worsened. Plaintiff's expert opines that the standard of care for Rankin's thyroid goiter required removal within a span of days to weeks and that the delay in scheduling Rankin's follow-up appointment also deviated from the standard of care. True, Defendants' expert, Dr. Tubb, states in his report that the time between the referrals and the appointments was reasonable and in line with the standard of care for a thyroid goiter. (*See generally* Tubbs Rep. [215-9].) A jury may thus find in Nurse Tuell's favor on this issue, but the evidence is sufficient to create a dispute of fact on whether the delays reflect deliberate indifference.

"Whether the length of delay is tolerable depends upon the seriousness of the condition and the ease of providing treatment." *Perez*, 792 F.3d at 778. Plaintiff's expert witness testified that Rankin suffered from a serious, potentially life-threatening condition that needed to be treated in weeks at most, rather than the year and a half it took. Further, he said that the delay in the follow-up that Nurse Tuell ordered was particularly notable, given that there was a risk of malignancy. This testimony, and the evidence that Nurse Tuell failed to mark the referral as urgent or to take action when her own referral was delayed without explanation for over four months, is sufficient to preclude summary judgment. *See Goodloe*, 947 F.3d at 1032 (reversing summary judgment for doctor where plaintiff was required to wait three months for specialist appointment while in pain from anal fissures, noting that "[a]lthough the district court determined that the delay in [plaintiff's] receiving the outside evaluation reflected an administrative error, a jury could see the facts another way"); *see also White v. Woods*, 48 F.4th 853 (7th Cir. 2022) (reversing summary judgment for doctor and nurse practitioner where jury could find that "continued conservative treatment was ineffective and delayed [plaintiff] from receiving adequate medical care").

That the goiter was ultimately benign and did not advance to the point of life-threatening airway obstruction does not change this conclusion. "Custodians are not excused from ensuring

27

adequate treatment for inmates with chronic or degenerative conditions simply because any resulting harms may remain latent or have not yet reached the point of causing acute or life-threatening injuries." *McDonald v. Hardy*, 821 F.3d 882, 889 (7th Cir. 2016) (reversing grant of summary judgment for officers who fired prison dietician and refused prescribed low-cholesterol diet, despite no evidence that plaintiff's cholesterol levels rose as a result). Rankin suffered from unnecessary pain and surgery because of deliberate indifference to these risks. A reasonable jury may conclude that Nurse Tuell is guilty of negligence only; for now, viewing the evidence in the light most favorable to Rankin, summary judgment in her favor is denied.

### C.    Smith

Wexford argues that Rankin cannot prove that Smith acted with deliberate indifference, nor that her actions caused his injuries. Here, the court agrees.

Smith was responsible for scheduling Rankin's appointment for an ultrasound and FNA biopsy. Dr. Zahtz made this referral in October 2017 and marked it as urgent, yet it was not scheduled until January 2018. Smith testified that she did not do anything different when a referral was marked as urgent, despite her ability to call and request more prompt appointments. Smith was also responsible for requesting the results from Rankin's biopsy and scheduling his follow-up, and she testified that she usually requested results within a day of a patient's return to Dixon from a test. But the record shows she did not request Rankin's results for more than two months after his return. Throughout February and March, progress notes indicate that no appointment had been scheduled and no one had received the results. The evidence also shows that Smith had the ability to speed up approvals, call schedulers at hospitals to communicate urgent requests, and request results within a day or two of their availability; she in fact did these things at various points in Rankin's treatment. Yet at critical times in his treatment, she failed to do so.

The court nevertheless concludes this evidence is insufficient to establish that Smith acted with deliberate indifference. As explained above, "unexplained delays could support a deliberate indifference claim if [Smith] was aware of the severity of [Rankin's] condition." *Perez*, 792 F.3d

at 778.  Smith admitted that she processed referral forms that were marked as urgent and showed that providers had diagnosed Rankin's goiter as requiring treatment.  Smith is not a medical provider, however.  She testified that she reviewed medical records in order to ascertain what clinic an inmate was referred to.  There is no evidence that Smith read any specific entry that would have put a lay person like herself on notice of the serious risk to Rankin.  Plaintiff's expert report, while helpful in showing how a healthcare provider should have treated Rankin's condition, does not establish a standard that would apply to administrative staff like Smith.  Ultimately, there is no evidence that she actually drew the inference from Rankin's records that a substantial risk of harm existed.  *Boyce v. Moore*, 314 F.3d 884, 888 (7th Cir. 2002) ("[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.").

Smith's conduct may have amounted to negligence, or even gross negligence, but that "is insufficient to constitute deliberate indifference."  *Id.* at 889–90 (affirming summary judgment for officer, holding that any failure to review logbooks which documented injuries was at most negligence, and even if he did read it, it would not present "evidence of an obvious excessive risk" sufficient to infer knowledge); *McGowan*, 612 F.3d at 640 ("But negligence, even gross negligence, does not violate the Constitution.").  Smith is entitled to summary judgment.

### D.    Wexford

Rankin brings a claim for *Monell* liability against Wexford as well.  *See Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690–91 (1978).  As is well recognized, municipalities, or corporations like Wexford who act under the color of state law, cannot be held vicariously liable for Eighth Amendment violations.[16]  *See id.*  Consequently, to bring a deliberate

---

[16]    That a private corporation is shielded from *respondeat superior* liability is not intuitive.  Indeed, corporations are traditionally subject to vicarious liability for the actions of their employees taken within the scope of their employment, and corporations face much different market pressures and incentives than municipalities.  *See Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 790–94 (7th Cir. 2014) (expressing skepticism of *Monell* doctrine as applied to corporations);

indifference claim against Wexford, Rankin must prove that a Wexford policy or custom caused his constitutional deprivation. *Feazell v. Wexford Health Sources, Inc.*, 140 F.4th 438, 442–43 (7th Cir. 2025) (citing *Monell*, 436 U.S. at 690–91). Wexford can be held liable for *Monell* liability under § 1983 if it has

> (1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority. . . . Moreover, inaction can give rise to liability under *Monell* if it reflects a conscious decision not to take action where necessary to remedy a potentially dangerous practice.

*Sanders v. Moss*, 153 F.4th 557, 570 (7th Cir. 2025) (citations and internal quotation marks omitted).

Rankin does not argue that a person with final policymaking authority caused his injury. Consequently, he must show that the constitutional violation was caused by either (1) Wexford's express policy, or (2) the company's "custom or practice." *Id.* This custom or practice must be "the moving force" behind the constitutional violation, and Rankin must show "a direct causal link between the challenged municipal action and the violation of [Rankin's] constitutional rights." *Feazell*, 140 F.4th at 443 (citation and internal quotation marks omitted). Importantly, Rankin must also show deliberate indifference on Wexford's part, meaning that the policy or custom is either (1) facially unconstitutional, or (2) "that it was obvious that [Wexford's] action would lead to constitutional violations and that [Wexford] consciously disregarded those consequences." *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 235 (7th Cir. 2021) (citation and internal quotation marks omitted).

Rankin argues that Wexford had a practice of automatically sending inmates to UIC for cost-cutting reasons, because it could send up to a certain number of inmates to UIC without it counting towards its Annual Utilization Threshold. Plaintiff claims that Wexford followed this policy

---

*see also Howell v. Wexford Health Sources, Inc.*, 987 F.3d 647, 653–54 (7th Cir. 2021) (same). This court is, of course, bound by Seventh Circuit precedent on this issue.

and continued sending Rankin to UIC despite known delays in UIC's care, and despite the availability of closer hospitals that could provide more prompt treatment. Indeed, the facts show that Rankin, with the exception of CGH in August 2018, was always referred to UIC despite repeated delays in scheduling, which he claims caused the lengthy wait for surgery. Having reviewed the record on this issue, the court finds insufficient evidence that Wexford's policies were the moving force behind Rankin's injury.

### 1.    Plaintiff's New Factual Theory

In its motion, Wexford first argues that the court should not consider Rankin's *Monell* argument at all because it is not based on the same factual theory pleaded in his complaint. In his complaint, Rankin advanced two theories of *Monell* liability that do in fact differ from the one he presses now. (Third Am. Compl. [86] ¶¶ 97–108.) First, Rankin alleged in his complaint that Wexford had a practice of delaying or denying surgeries for inmates, which was implemented via their collegial review process. Second, though Rankin now argues Wexford should have sent him to a local (non-UIC) facility sooner, he alleged in his complaint that Wexford had a practice of *limiting* the patients it sent to UIC so that it would not exceed its allotted annual visits. Consequently, he alleged, Rankin was sent to CGH in August 2018, which was under-equipped to handle his case, and caused his surgery to be delayed.

An attempt to change a factual theory at summary judgment "may amount to an attempt to amend the complaint." *Chessie Logistics Co. v. Krinos Holdings, Inc.*, 867 F.3d 852, 859 (7th Cir. 2017). Still, "district courts retain discretion to interpret new factual allegations or claims presented in a plaintiff's briefs as a constructive motion to amend." *Ollison v. Gossett*, 136 F.4th 729, 740 (7th Cir. 2025) (citing *Schmees v. HC1.COM, Inc.*, 77 F.4th 483, 488 (7th Cir. 2023)) (affirming district court's refusal to consider a new factual theory underlying a deliberate indifference claim, specifically that the warden ignored issues with provider tenure, absenteeism, and other deficiencies, after plaintiff alleged only that the warden ignored his grievances). But "simply because the district court may consider new factual allegations does not mean it is

required to do so.  On the contrary, '[i]t will rarely be appropriate to do so.'" *Id.* at 740 (citation omitted) (alteration in original).[17]  The court must pay "particular attention to the potential for prejudice to other parties."  *Schmees*, 77 F.4th at 489–90.

Rankin's current argument is troubling because while it relates to Wexford's cost-cutting and referral practices, it indeed differs from what he alleged in his complaint.  There, he asserted that it was Wexford's policy of *limiting* the inmates it sent to UIC that caused the delay in his surgery; now, he contends Wexford engaged in a practice of *automatically* sending inmates to UIC.  Both theories do, however, relate to a topic that was unquestionably the subject of discovery:  Wexford's off-site referral practices, specifically to UIC.   Although Wexford contends that discovery was exclusively focused on the allegation that Dr. Zahtz refused to utilize UIC, the court is skeptical that discovery would have looked much different had the allegation been that Dr. Zahtz automatically referred patients to UIC.  Regardless of Plaintiff's theory, Wexford would have gathered information it needed to respond to this argument; indeed, it has successfully done so, and the likelihood that Wexford is prejudiced by the court's consideration is low.  *Id.* at 487 ("District courts are to 'freely give leave [to amend] when justice so requires.'" (citing FED. R. CIV. P. 15(a)(2))).  In any event, as explained here, the court concludes that Wexford is entitled to summary judgment even under this new theory.

### 2.  *Monell* Liability

In response to Rankin's new theory, Wexford argues that (1) Wexford did not deny Plaintiff medical care; (2) any delay in this case was out of Wexford's control; and (3) Rankin cannot show that Wexford had a policy of automatically sending inmates to UIC, or that any policy that Wexford did have with respect to UIC was deliberately indifferent to medical needs.  For the reasons stated below, the court finds this last argument persuasive.

---

[17]     The Seventh Circuit also rejected the idea that the defendants were on notice of the new factual theory just because it was mentioned in discovery requests, depositions, and expert reports, which Rankin similarly relies on here.  *Id.* at 740–41.

32

First, however, the court pauses to note that Wexford could be liable for deliberate indifference even if it did not outright deny medical care. *See Glisson v. Ind. Dep't of Corr.*, 849 F.3d 372 (7th Cir. 2017) (en banc) (reversing grant of summary judgment for municipal defendant because jury could find that defendant's decision to not provide a policy for coordinated care amounted to deliberate indifference, even though plaintiff received care, and individual provider's care was not deliberately indifferent). Second, the court rejects Wexford's argument that it had *no* control over delays here. In *Walker v. Wexford Health Sources, Inc.*, the court recognized that Wexford is not liable for something which it has no control over—that is, the appointment dates that UIC picked out for inmates. 940 F.3d 954, 967 (7th Cir. 2019) ("Wexford cannot be accused of 'deferring' to UIC when Wexford had no control over UIC. To defer to another suggests the relinquishment of power or control, which did not exist here."). In this case, however, Rankin points to the act of referring inmates to UIC in the first instance. Although UIC may control the scheduling of appointments at its facilities, Wexford indeed has control over which facilities its doctors may send inmates to for treatment.

Importantly, however, Wexford insists that there is no evidence of a custom or policy on Wexford's part to "automatically" send patients to UIC, for reasons of cost-cutting or otherwise. The court agrees, as explained below, that there is insufficient evidence to show that Wexford was deliberately indifferent in its referral practices.

As Rankin acknowledges, the critical question is whether it was "*Wexford's* 'established [corporate] custom,'" that caused Rankin's injuries. (Pl.'s Br. [245] at 30 (emphasis in original) (citing *J.K.J. v. Polk Cnty*, 960 F.3d 367, 377 (7th Cir. 2020))); *Glisson*, 849 F.3d at 381 ("The critical question under *Monell* remains this: is the action about which the plaintiff is complaining one of the institution itself, or is it merely one undertaken by a subordinate actor?"). Wexford has a preference for UIC, and Dr. Zahtz testified that UIC was the "go-to" for non-emergent procedures because of the state's relationship with UIC, which was based on the quality of care offered. The ultimate decision of where to send an inmate requiring hospital care, however, was that of the

provider.  Dr. Zahtz had authority to choose the hospital where an inmate would be treated, based on considerations including how quickly an inmate needed to be seen or where specialists were located.  He testified that he did not consider utilization or costs in deciding where to refer an inmate, and he was not otherwise instructed by Wexford to use UIC despite delays in care. Wexford, for its part, would pay for the visit regardless of where it occurred.

The evidence in this record does not support the idea that Wexford had a practice of influencing Dr. Zahtz's choice of hospital based on cost-cutting.  True, the fact that Dr. Zahtz did not personally consider costs when choosing an offsite facility is not dispositive as to whether Wexford had a practice of sending inmates to UIC for cost-cutting reasons, but his autonomy on this issue is inconsistent with a finding that Wexford was formally or informally influencing provider decisions based on cost-cutting concerns—the reason Plaintiff alleges Wexford preferred UIC. Rankin otherwise relies on Wexford's contract with IDOC and corporate testimony to establish that this practice existed.  But that evidence simply establishes that Wexford's compensation is measured differently for visits at UIC.  *Zavala v. Obaisi*, No. 17-CV-03042, 2021 WL 1172774, at *14 (N.D. Ill. Mar. 29, 2021) (granting summary judgment on *Monell* claim) ("Even assuming that contractual language amounts to an 'official policy' actionable under *Monell* (an assumption that may be incorrect), the contractual provisions [cited] do not condone prioritizing cost-cutting over proper medical care or reasonable medical judgment.")  The facts also do not show any practice of requiring doctors to send patients to UIC.  Under whatever informal practice Wexford had with respect to UIC, doctors clearly had the discretion to send inmates to local hospitals when they felt it was necessary.  There is also no evidence that Wexford was training or instructing its doctors to keep sending patients to UIC even when the condition required more urgent treatment.

A jury might still infer that Wexford had some informal practice of defaulting to UIC for non-emergent procedures, and that Dr. Zahtz's decision to keep sending Rankin to UIC was a result of this practice.  If so, the jury would be required to determine whether this preference for UIC "reflects a conscious disregard for a known or obvious risk of the constitutional deprivation."

*Dean*, 18 F.4th at 237. Notably, Rankin does not argue that Wexford's practice of using UIC as a preferred provider is unconstitutional on its face; instead, he argues that the preference for UIC "caused unconstitutional delays as applied to him." *Id.* at 236 (reversing judgment for plaintiff after jury trial for claim of deliberate indifference against Wexford based on its collegial review practice). But a "plaintiff seeking to hold a municipality liable for a facially lawful policy generally must prove a prior pattern of similar constitutional violations resulting from the policy." *Id.* In terms of specific, substantive examples of constitutional violations resulting from Wexford's preference for UIC, Rankin has only his own story. He also cites the *Lippert* report and the QIC report to establish Wexford's deliberate indifference, but these reports are insufficient to meet his burden on this issue. As for the *Lippert* report, the Seventh Circuit has suggested in dicta that reports admitted only for notice purposes are insufficient to establish deliberate indifference. *Id.* at 238. At most, that report, and the QIC findings (arguably reflecting Wexford's concern about the delays), are insufficient to establish that Wexford acted with deliberate indifference. The reports put Wexford on notice of systemic deficiencies, but those deficiencies by themselves are not evidence of constitutional violations. *Id.* ("[T]he report said nothing about the harm (if any) resulting from the reported delays, making it difficult to infer solely from the report that Wexford knew of any unconstitutional consequences from the delays."). Consequently, a jury could not find that Wexford was on notice that its practices with respect to UIC would likely lead to constitutional violations. *Stockton*, 44 F.4th at 618 (affirming summary judgment on *Monell* claims because the reports showing systemic deficiencies "do not connect this purported municipal practice to any inmate injury"); *Walker*, 940 F.3d at 967 ("Absent evidence that Wexford was on notice that these wait times were likely to cause constitutional violations, but failed to act in response, we cannot hold Wexford liable.").

The court recognizes that there can be the "rare" case where "the risk of unconstitutional consequences from a municipal policy 'could be so patently obvious that a municipality could be liable under § 1983 without proof of a pre-existing pattern of violations.'" *Dean*, 18 F.4th at 236

(quoting *Connick v. Thompson*, 563 U.S. 51, 64 (2011)).  But this is not one of those cases—the Seventh Circuit has explicitly rejected this theory where there is an exception in the policy or practice for emergent or urgent situations.  Thus in *Dean*, the court reversed judgment for the plaintiff on a *Monell* claim based on Wexford's collegial review practices, stating:

> The district court relied on the "obviousness" theory, reasoning that the jury could find that collegial review on its face would obviously and inevitably delay urgently needed care for some inmates, including Plaintiff for no medical reason.  But as we discuss below, Wexford allows its medical directors to go outside the normal collegial review process in urgent or emergent situations, so it could not have been obvious from the face of the policy that collegial review would delay urgently needed care.  If offsite care was urgent, the policy provided an exception to prevent harmful delays.

*Id.* (citation and internal quotation marks omitted).  Here, similarly, Wexford's practice was a preference for UIC in non-emergent cases.  But doctors had the authority to choose other facilities for inmates, especially in those situations where more urgent care or a certain specialist was required.  There is insufficient evidence that this preference violated the Constitution.

For these same reasons, the court finds that Rankin fails to show "moving-force" causation.  Rankin "must show that [the preference for UIC] itself—not simply the actions of the employees administering it—directly caused his constitutional deprivation."  *Id.* at 239 (holding that plaintiff failed to show causation where expert opined that had the exception for urgent or emergent cases been followed, it would have prevented delays in care, and the delay was more likely caused by the individual agents); *see also Von Ryburn v. Obaisi*, No. 14 CV 4308, 2022 WL 1444309, at *8 (N.D. Ill. May 6, 2022) (granting summary judgment on *Monell* claim based on Wexford's policy to refer non-emergent cases to UIC).  Dr. Zahtz testified in this case that it was his decision where to send Rankin, and that he was allowed to take into account emergencies and specialist availabilities in that decision.  There is insufficient evidence that Wexford policy was the moving force behind the constitutional deprivation.

The case law Rankin cites on this issue is compelling, but ultimately distinguishable, as they involve policies much more problematic (which leave no room for provider discretion) or detail

specific instances of harm to inmates. *See Long v. Wexford Health Sources, Inc.*, No. 18 C 2358, 2024 WL 1283537, at *3 (N.D. Ill. Mar. 26, 2024) (denying summary judgment for policy of refusing off-site optometrist appointments where administrator told plaintiff he must wait for onsite optometrist to be hired to be seen, but no optometrist was hired, and doctor testified to a 500-person waitlist at the prison to see the non-existent optometrist); *Reaves v. Wexford of Ind., LLC*, No. 1:20-cv-02945, 2023 WL 2388718 (S.D. Ind. Mar. 7, 2023) (denying summary judgment, where treatment was delayed due to a policy that inmate could not be seen by a provider until after an x-ray was taken, but x-rays were limited to particular days and inmate did not have an x-ray for more than a week).[18]  Rankin could argue that Wexford violated the constitution by taking no steps to address physician failures to account for urgent conditions in their referrals. (*See* Pl.'s Br. [245] at 5 (noting Wexford made no "policy or procedure change" as a result of the QIC study, and gave Dr. Zahtz no "guidance or information about how to deal with the speed at which things were happening at UIC")).  That argument fails for the same reason: the evidence is insufficient to support it.

The court grants summary judgment in favor of Wexford.

---

[18]     In *Hernandez v. Ill. Dep't of Corr.*, the court denied summary judgment based on a practice of failing to enforce the requirement that personnel respond to call buttons, or to keep the call button on at all.  No. 3:17-CV-1335-NJR, 2021 WL 3353860 (S.D. Ill. Aug. 2, 2021).  There was significant evidence of specific, past failures, and the risk of harm of failing to respond to emergencies was high.  Specifically, there were numerous grievances filed about failures to respond to call button requests, testimony that call buttons were turned off because the inmates did not hear beeping when they pressed the button, evidence that nurses told inmates the call button was turned off, and another inmate who submitted an affidavit describing a failure to respond to the call button.  *See also Tolliver v. Wexford Health Sources, Inc.*, No. 16-CV-130-SMY, 2021 WL 4554753 (S.D. Ill. Oct. 5, 2021) (finding Wexford had an express policy of denying prisoners access to providers during lockdown except in emergencies; corporate representative testified to such a policy, and staff were instructed that plaintiff's fracture should not be deemed an emergency).

**CONCLUSION**

Motions for summary judgment of Defendants Smith [213] and Wexford [216] are granted.

Motions for summary judgment filed by Dr. Zahtz [219] and Nurse Tuell [222] are denied.

ENTER:

Dated:  December 30, 2025

_____
REBECCA R. PALLMEYER
United States District Judge